RECEIVED **IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

2005 JUN 21 ☐ 4: 58

**UNITED STATES OF AMERICA**                    )
DEBRA P. HACKETT, CLK                           )
U.S. DISTRICT COURT                             )
MIDDLE DISTRICT ALA                             )       **CR. NO.   3:05CR141-F**
                                                )            **[18 U.S.C. § 1344**
**ROY TERRY**                                   )            **18 U.S.C. § 664**
                                                )            **18 U.S.C. § 1343**
                                                )            **18 U.S.C. § 1341**
                                                )            **18 U.S.C. § 2314]**
                                                )
                                                )       **INFORMATION**

The United States Attorney charges:

    At all times material to this Information:

    1.    ROY TERRY, defendant herein, was the President and Chief Executive Officer of

          Terry Manufacturing Company (hereinafter "Terry Mfg."), a uniform and clothing

          manufacturer based in Roanoke, Alabama, within the Middle District of Alabama.

    2.    Terry Mfg. was in the business of manufacturing uniforms for the Department of

          Defense, the United States Forestry Service, and McDonald's Corporation, as well

          as various other forms of clothing production.

    3.    Terry Mfg. employed over 200 employees at its locations in Roanoke, Alabama,

          and Atlanta, Georgia.

    4.    In June 2003, ROY TERRY admitted to representatives from banks and the

          United States government that he and Terry Mfg. had overstated Terry Mfg.'s

          assets by over $35 million in corporate financial statements previously provided to

          such entities.

    5.    In July 2003, Terry Mfg. collapsed and filed for bankruptcy amid claims from

numerous creditors to whom it owed delinquent payments.

**ROY TERRY OBTAINS BANK LOANS FOR TERRY MANUFACTURING**

6.    In his official capacity with Terry Mfg., ROY TERRY sought loans to fund Terry

Mfg. operations. Specifically, ROY TERRY sought and obtained the following

loans on behalf of Terry Mfg.:

a.    On or about August 30, 1995, Terry Mfg. obtained $10 million worth of

loans from First Bank of Roanoke, Alabama ("First Bank"), and Southtrust

Bank of Birmingham, Alabama ("Southtrust"). These loans were partially

guaranteed by the United States Department of Agriculture (hereinafter

"USDA").

b.    On or about July 22, 1999, Terry Mfg. obtained a second $10 million

worth of loans from First Bank and Southtrust. These loans were again

partially guaranteed by USDA.

c.    On or about October 23, 2001, Terry Mfg. obtained $8.5 million worth of

loans from First Bank and Southtrust. These loans were again partially

guaranteed by USDA.

d.    On or about December 27, 2002, Terry Mfg. obtained a $2.5 million loan

from Southtrust. This loan was not guaranteed by USDA, but was

personally guaranteed by ROY TERRY.

e.    The applications for the 1999, 2001, and 2002 loans and the quarterly and

annual financial reports for all loans submitted by ROY TERRY and Terry

Mfg. contained materially false information in that the financial condition

of Terry Mfg. was misrepresented, as explained and averred <u>infra</u> at

paragraphs 55 through 100 herein.

**ROY TERRY OBTAINS PERSONAL LOANS FROM BANKS**

7.    In his personal capacity, ROY TERRY sought other loans secured against his

common stock in Terry Mfg. These loans included the following transactions:

a.    On or about June 28, 2002, ROY TERRY, with another person known to

the United States Attorney, applied for and received a loan from the Bank

of Wedowee in Wedowee, Alabama (hereinafter "Bank of Wedowee"), in

the amount of $1,616,804.55.

b.    On or about August 26, 2002, ROY TERRY, with another person known

to the United States Attorney, applied for and received a renewal of his

prior loan with the Bank of Wedowee for an amount totaling

$2,098,582.00, which included the amount received in his prior loan.

c.    On or about January 30, 2003, ROY TERRY applied for and received a

loan from First Tuskegee Bank, Tuskegee, Alabama (hereinafter "First

Tuskegee"), for $546,383.01.

d.    On or about February 25, 2003, ROY TERRY applied for a loan from

Small Town Bank of Wedowee, Alabama (hereinafter "Small Town"), in

the amount of $1.75 million. This loan was applied for on a personal

basis, but was expressly "to be used for business purposes." Small Town

denied the loan application.

e.    On or about March 26, 2003, ROY TERRY, with another person known to

the United States Attorney, applied for and received another loan from First Tuskegee for $484,800.00.

f.      The applications and subsequent financial reports submitted by ROY TERRY for these loans contained materially false information in that the financial condition of Terry Mfg. was misrepresented, as explained and averred infra at paragraphs 55 through 67 and 96 through 100 herein.

## ROY TERRY OBTAINS LOANS FROM PRIVATE INVESTORS FOR TERRY MFG.

8.      In his official capacity, ROY TERRY solicited loans from investors purportedly to fund the operations of Terry Mfg. and related entities. These loans included the following transactions:

a.      In or about September 2002, ROY TERRY proposed loan investments to Stanford Stoddard and John Bernard (hereinafter "Stoddard & Bernard"), using interstate wire communications, specifically telephone calls and facsimiles, purportedly to facilitate the purchase of fabric for camouflage military uniforms pursuant to a previously secured option on the fabric.

b.      At or about the same time in September 2002, ROY TERRY made a similar loan proposal to O'Neil Swanson (hereinafter "Swanson"), using interstate wire communications, specifically telephone calls and facsimiles, the proceeds of which was purportedly to facilitate the purchase of fabric for camouflage military uniforms at a deep discount. ROY TERRY represented that the deep discount had to be acted on immediately.

c.    The proposal made to Stoddard & Bernard was accepted by Stoddard & Bernard on or about September 11, 2002. A total of $750,000 was loaned to Terry Mfg. and ROY TERRY pursuant to the proposal.

d.    The proposal made to Swanson was accepted by Swanson on or about September 16, 2002. A total of $300,000 was loaned to Terry Mfg. and ROY TERRY pursuant to the proposal.

e.    In or about March 2003, ROY TERRY proposed a similar loan investment to Roosevelt McCorvey and related investors (hereinafter "McCorvey Investors"), purportedly to facilitate the purchase of fabric for camouflage military uniforms pursuant to a previously secured option on the fabric.

f.    The proposal was accepted by the McCorvey Investors on or about March 27, 2003. A total of $1.25 million was loaned to Terry Mfg. and ROY TERRY pursuant to the proposal.

g.    ROY TERRY misrepresented the purpose of each of the above loans from Stoddard & Bernard, Swanson, and the McCorvey Investors. The option for fabric cited by ROY TERRY for the loan transactions for Stoddard & Bernard and the McCorvey Investors did not exist and there was no deep discount that ROY TERRY needed to act quickly to secure with respect to the Swanson loan.

h.    ROY TERRY failed to advise Stoddard & Bernard, Swanson, and the McCorvey Investors of the state of Terry Mfg. and the nature of the risk of the loans. Moreover, ROY TERRY overstated the value of the common

stock he pledged as collateral for the loans to Stoddard & Bernard and the McCorvey Investors and did not disclose to Stoddard & Bernard, Swanson, or the McCorvey Investors the fact that Terry Mfg. had outstanding loans to banks that exceeded the true value of Terry Mfg. and that such banks held what assets Terry Mfg. possessed as collateral for those loans.

i.    At no time did ROY TERRY disclose to Stoddard & Bernard, Swanson, or the McCorvey Investors that such an unapproved loan or investment would violate the terms of his and Terry Mfg.'s loan agreements with First Bank and Southtrust, which placed strict limitations on Terry Mfg.'s ability to borrow or invest additional capital.

j.    ROY TERRY misrepresented the state of Terry Mfg. in connection with the loans from Stoddard & Bernard, Swanson, and the McCorvey Investors in that he supplied false audited financial statements that substantially misrepresented Terry Mfg.'s level of accounts receivable and inventory.

k.    ROY TERRY misrepresented the nature of the guaranteed return on the loans to Stoddard & Bernard, Swanson, and the McCorvey Investors. The return was never realized, and Terry Mfg. collapsed and filed for bankruptcy protection before the loans were repaid.

## ROY TERRY MISREPRESENTS STATE OF TERRY MFG. TO ROBINSON FAMILY IN CONNECTION WITH SERIES OF INVESTMENTS

9.    In or about August 2001, ROY TERRY solicited loans from Anthony and Yvonne

-6-

Robinson (hereinafter "the Robinsons") for the purpose of: (1) providing working capital for Terry Mfg. pending payment by the Department of Defense and United States Forestry Service on certain contracts; and (2) purchasing a certificate of deposit to provide capital as security for a USDA guaranteed loan ROY TERRY was seeking from First Bank and Southtrust.

10.     In soliciting such loans from the Robinsons, ROY TERRY did not disclose the state of his company, despite inquiries about his company's financial statements.

11.     In or about August and September 2001, ROY TERRY misrepresented through interstate wire communications, namely telephone conversations, that Terry Mfg. was in good financial condition, when in fact ROY TERRY knew and believed that Terry Mfg. was not in good financial condition and was in need of capital, as evidenced and alleged infra at paragraphs 75 through 82 and 97 thorough 100.

12.     On September 9, 2002, ROY TERRY sent a copy of Terry Mfg.'s audited financial statement for the year ending December 31, 2001 (hereinafter "2001 Audited Financials") via facsimile from Roanoke, Alabama, to the Robinsons in Maryland.  As discussed infra at paragraphs 55 through 62, 75 thorough 82, and 97 through 100, the 2001 Audited Financials contained materially false information.

13.     In or about March or April 2003, ROY TERRY again contacted the Robinsons regarding the opportunity to loan to, or invest in, Terry Mfg. approximately $250,000. ROY TERRY represented to the Robinsons through interstate wire communications, namely telephone calls and facsimiles, that this loan or

investment was to fund an exclusive clothing manufacturing arrangement with a national radio personality. ROY TERRY represented that this loan or investment was desperately needed in April 2003 to finalize a deal with the national radio personality.

14. ROY TERRY submitted a proposal to the Robinsons regarding the requested loan or investment to fund the radio personality exclusive clothing arrangement. In that proposal, ROY TERRY referenced an opportunity to purchase clothing at a highly discounted price.

15. At no time did ROY TERRY disclose to the Robinsons that such an unapproved loan or investment would violate the terms of his and Terry Mfg.'s loan agreements with First Bank and Southtrust, which placed strict limitations on Terry Mfg.'s ability to borrow or invest additional capital.

16. On or about April 24, 2003, the Robinsons wired $250,000 from Maryland to an account held by Terry Mfg. at the Bank of America in Atlanta, Georgia.

17. The contract for the $250,000 loan or investment was not sent by ROY TERRY to the Robinsons until July 9, 2003, two days after Terry Mfg. filed for bankruptcy. The contract did not mention the fact that Terry Mfg. had filed for bankruptcy or that Southtrust and First Bank had sought the appointment of a receiver. The contract, which was purportedly between Terry Mfg., ROY TERRY, Rudolph Terry and the Robinsons, pledged 100 shares of Terry Mfg. common stock as collateral without any mention of the fact of the bankruptcy or the disclosure of the overstated levels of assets and liabilities, which had already been disclosed to

-8-

Southtrust and First Bank through the "May 31 Listing" discussed infra at paragraphs 97 through 100.

18. Although a Terry Mfg. related-entity had a clothing arrangement with the radio personality, that arrangement was based on royalty payments, not a lump sum investment of the type solicited from the Robinsons, and was explicitly non-exclusive. Moreover, the clothing arrangement was a small-scale venture, involving only screen printing on shirts and like products that were already within the ken and capability of Terry Mfg.'s operations.

19. The Robinson's investment was not used to fund the arrangement with the radio personality, but was used to pay general operating expenses of Terry Mfg. at a time when the company was in desperate need of capital.

20. The Robinsons have not been repaid for their investment which was purportedly to fund the falsely described arrangement with the radio personality, which was, in fact, not the actual, intended purpose for the money.

21. Following Terry Mfg.'s filing for bankruptcy, including from July 2003 until October 2003, ROY TERRY assured Anthony Robinson, that ROY TERRY would repay the Robinsons. No such payment has been received.

**ROY TERRY OBTAINS LARGE AMOUNT OF CREDIT FROM SUPPLIER**

22. Beginning in or about February 2001, the exact date being unknown to the United States Attorney, and continuing until in or about June 2003, ROY TERRY, in his official capacity, sought and received credit from H.L.C. Industries (hereinafter "HLC") for Terry Mfg. to purchase fabric for camouflage military uniforms.

23.    HLC is a fabric converter based in of Bala Cynwyd, Pennsylvania. A fabric
       converter does not manufacture fabric, but receives orders for finished fabric and
       arranges for the fabric to be obtained and finished to specifications set forth by the
       HLC customer and/or governmental entities for whom the fabric is ultimately
       intended.

24.    HLC sells military camouflage fabric, including desert camouflage fabric, and has
       supplied Terry Mfg. with military camouflage fabric since the early 1980s.

25.    To facilitate the extension of credit referenced supra at paragraph 22, ROY
       TERRY provided information and documents for the acquisition of insurance to
       secure credit from HLC. In sum, ROY TERRY obtained approximately $1.9
       million in credit from HLC.

26.    Among the documents provided by ROY TERRY were false annual financial
       statements that misstated the level of accounts receivables and inventory held by
       Terry Mfg.

27.    The credit obtained by ROY TERRY for Terry Mfg. was insured by annual credit
       insurance policies issued by Euler American Credit Indemnity Company
       (hereinafter "Euler") between 2001 and 2003, which covered the full amount of
       credit, subject to a 20% deductible. Accordingly, the $1.9 million in credit
       obtained by Terry Mfg. from HLC was recoverable, if at all, from Euler in the
       amount of approximately $1.5 million.

28.    The false financial statements provided by ROY TERRY were material to the
       above-described extension of credit and the credit insurance in that, if the true

-10-

financial condition of Terry Mfg. had been revealed, neither the credit nor the credit insurance would have been extended.

## ROY TERRY OBTAINS MILLIONS OF DOLLARS IN INVESTMENTS AND LOANS FROM N. DUDLEY HORTON, JR., AND HORTON'S COMPANIES

29.    N. Dudley Horton, Jr. (hereinafter "Horton") is a businessman who resides and works in or about Eatonton, Georgia. Horton is the part-owner and President of Horton Homes, a subsidiary of Horton Industries. He is also President and part owner of American Testing Labs, Inc., d/b/a Wholesale Distributors (hereinafter "Wholesale"), and a part owner of American Real Estate Investment Company, Inc. (hereinafter "ARE").

30.    ROY TERRY, in his official capacity with Terry Mfg., along with another person known to the United States Attorney, solicited investments from Horton and Horton's companies.

31.    To support these solicitations for investment, ROY TERRY made representations through financial documents, contracts, loan documents, memoranda, and verbal communications regarding the state of Terry Mfg. and Terry Mfg.'s business operations.

32.    In or about November 2000, ROY TERRY, both in his personal capacity and official capacity with Terry Mfg., along with another person known to the United States Attorney, contacted Horton about a loan to ROY TERRY, Terry Mfg., and Rudolph Terry for the purported purpose of establishing a new business division for Terry Mfg. to be known as Terry Promotional Products.

33.     The loan sought by ROY TERRY and the other person known to the United States
        Attorney was for $5.5 million.

34.     On or about November 10, 2000, ROY TERRY, Rudolph Terry, and Horton
        executed a contract (hereinafter "Agreement") and a promissory note labeled
        "Line of Credit Promissory Note" wherein Horton, through ARE, agreed to loan
        ROY TERRY, Terry Mfg., and Rudolph Terry $5.5 million for the purported
        purpose of "the capitalization of the Terry Promotional Products venture. . . ."

35.     In the parties' Agreement, ROY TERRY represented that "Terry shall utilize
        proceeds from the loan to capitalize Terry Promotional Products," knowing that
        such proceeds were, in fact, for other purposes, including satisfying general
        operating expenses of Terry Mfg. and paying outstanding payroll taxes.

36.     The funds provided by Horton through ARE were paid through a series of checks
        written on an account of the law firm Blasingame, Burch, Garrard, Bryant &
        Ashley, P.C., and deposited into one of Terry Mfg.'s accounts at the Bank of
        Wedowee.  For example, the first installment under the Agreement and Line of
        Credit Promissory Loan was a check deposited on or about November 13, 2000, in
        the amount of $1,994,960.00.

37.     Terry Mfg.'s account at the Bank of Wedowee was very low in funds prior to the
        deposit of the first installment payment under the Agreement.  For example, on
        November 2, 2000, prior to the deposit of the first installment payment under the
        Agreement, Terry Mfg.'s balance of the Bank of Wedowee account was less than
        $10,000.

38.   The funds deposited into the Bank of Wedowee were not used for Terry Promotional Products, as unconditionally represented in the Agreement.

39.   For example, on or about November 15, 2000, a check was issued to the United States Department of the Treasury in the amount of $400,670.89, for the purpose of satisfying outstanding payroll taxes for Terry Mfg., such as Social Security withholdings.

40.   Additionally, on or about November 27, 2000, ROY TERRY made a payment to the Bank of Wedowee for $33,405 to satisfy an interest payment on an outstanding loan.

41.   By the end of November 2000, ROY TERRY had transferred or spent nearly all of the money obtained from ARE through the first installment under the Agreement, including approximately $1,315,000 in checks written payable to Terry Mfg. The total account balance at the end of the month was approximately $282,029.60

42.   On or about December 18, 2000, ROY TERRY deposited the second installment payment, which was a check for $1,000,000, by ARE under the Agreement into one of Terry Mfg.'s accounts at the Bank of Wedowee.

43.   On or about the same day, ROY TERRY issued a check from the account to the Bank of Wedowee in the amount of $133,400 to satisfy an outstanding loan amount.

44.   On or about December 26, 2000, ROY TERRY issued another check from the account to the Bank of Wedowee in the amount of $33,305 to satisfy an outstanding loan amount.

-13-

45. The proceeds from future installment checks, which totaled approximately $5.5 million, inclusive of the first two installments, were consistently diverted to loan payments and other outstanding obligations of Terry Mfg. and ROY TERRY.

46. Contrary to ROY TERRY's representations to Horton and ARE, the funds paid by ARE pursuant to the Agreement were not used to capitalize Terry Promotional Products. Indeed, Terry Promotional Products was never capitalized, is not a formal business entity, has no tax records, and appears in name only in Terry Mfg. documents.

## ROY TERRY KITES CHECKS TO FUND TERRY MANUFACTURING EXPENSES

47. On or about February 28, 2003, the Bank of Wedowee filed a Suspicious Activity Report (SAR) regarding a pattern of check kiting by Terry Mfg.

48. Among its various bank accounts, Terry Mfg. had an account at the Bank of Wedowee (Acct. No. 5011256) and an account at First Bank (Acct. No. 1109308).

49. For a number of months, including the period from January 1, 2003, through February 18, 2003, ROY TERRY engaged in a pattern of depositing Terry Mfg. checks written on Acct. No. 5011256 into Acct. No. 1109308, and doing the same in reverse from Acct. No. 1109308 into Acct. No. 5011256.

50. As a result of both banks giving immediate credit for these deposits, despite one day or more of float time for the checks to clear between the bank accounts, ROY TERRY was able artificially to inflate the account balances in both Terry Mfg. accounts.

51. The combined daily balance of the two Terry Mfg. bank accounts was

fraudulently inflated by this scheme by as much as $952,032.

52.    Through this scheme, ROY TERRY defrauded both banks by using the inflated balances of these accounts to spend or withdraw funds to which ROY TERRY and Terry Mfg. would not otherwise be entitled.

53.    For example, during the period between January 1, 2003, and February 18, 2003, ROY TERRY fraudulently obtained for himself and Terry Mfg. approximately $2,460,098 in combined funds belonging to the Bank of Wedowee and First Bank by writing 57 checks totaling $8,565,500 during the check kiting scheme executed between the two Terry Mfg. bank accounts.

54.    All 57 checks were signed by ROY TERRY.

## ROY TERRY MISSTATES MATERIAL FACTS IN AUDITED FINANCIALS USED TO OBTAIN LOANS AND CREDIT

### False Statements Regarding Assets

55.    ROY TERRY, as Chief Executive Officer and President of Terry Mfg., signed audited financial statements on behalf of Terry Mfg. beginning at a time unknown to the United States Attorney's Office and continuing until on or about April 2003.

56.    Beginning in or about 1996 and continuing until the collapse of Terry Mfg. in 2003, ROY TERRY signed these audited financial statements knowing that they were false and misleading in that they significantly overstated Terry Mfg.'s assets, including accounts receivable and inventory, and completely omitted Terry Mfg.'s liabilities on unpaid pension obligations.

57.   For example, the audited financial statement for the year ending December 31,
      2001, (hereinafter "2001 Audited Financials"), falsely stated that Terry Mfg.
      owned $20,973,067 in inventory and held $13,279,203 in accounts receivable at
      the close of 2001.   These figures were grossly overstated and did not represent
      Terry Mfg.'s actual state of inventory and accounts receivable, which was over
      $10 million less in each category.

58.   The audited financial statement for the year ending December 31, 2002,
      (hereinafter "2002 Audited Financials"), falsely stated that Terry Mfg. owned
      $23,895,736 in inventory and held $14,834,870 in accounts receivable at the close
      of 2002. These figures were grossly overstated and did not represent Terry Mfg.'s
      actual state of inventory and accounts receivable, which was over $10 million less
      in each category.

59.   The audited financial statement for 2002 was produced in April 2003, just two
      short months before ROY TERRY admitted that Terry Mfg.'s actual level of
      accounts receivable and inventory was "estimated" to be less than $2 million.

**False Statements Regarding Pension Obligations**

60.   Beginning in or about February 2001 and continuing until the collapse of Terry
      Mfg. in July 2003, ROY TERRY failed to make and arrange for employee payroll
      withholdings and Terry Mfg. employer contributions to be made to the Terry Mfg.
      company pension plan.   The last contribution of any type paid into the plan was
      made on or about February 28, 2001.

61.   Based on Terry Mfg.'s failure to pay employee pension withholdings and

-16-

employer contributions to the Terry Mfg. company pension plan, the company had

outstanding obligations to the pension plan in years 2001, 2002, and 2003.

62.    Terry Mfg.'s 2001 Audited Financials and 2002 Audited Financials

misrepresented Terry Mfg.'s outstanding and unfulfilled obligation to the pension

plan. Specifically, both years' Audited Financials falsely state without

qualification that "Terry Manufacturing has no unfunded pension costs. . . ."

## ROY TERRY PRESENTED THE MATERIALLY FALSE AUDITED FINANCIAL STATEMENTS TO LENDERS AND INSURERS

63.    In applying for, and as a condition of, the loans he applied for or obtained for

himself and Terry Mfg., ROY TERRY presented false audited financial

statements to Southtrust, First Bank, First Tuskegee, Small Town, and Bank of

Wedowee.

64.    As explained supra at paragraphs 55 through 62, the false audited financial

statements were false in their listing of assets, including accounts receivable and

inventory, and their statement that Terry Mfg. did not have any unfunded pension

costs.

65.    Each of the loans issued by Southtrust, First Bank, First Tuskegee, and Bank of

Wedowee was conditioned on some form of collateral relating to the worth of

Terry Mfg. The loan contemplated by Small Town through the application

submitted by ROY TERRY was similarly conditioned on collateral relating to the

worth of Terry Mfg.

66.    Southtrust, First Bank, First Tuskegee, and Bank of Wedowee would not have

loaned Terry Mfg. the money that was loaned had the true financial picture of

Terry Mfg. been known. Moreover, had Southtrust, First Bank, First Tuskegee,

and Bank of Wedowee known the true financial picture of Terry Mfg. between the

date the respective loans were issued and the date of the bankruptcy, the banks

would have taken appropriate steps at such earlier time to secure their collateral

and recover the amounts still outstanding on the loans.

67.     Accordingly, for the foregoing reasons, the false statements of assets submitted in

the audited financial statements by ROY TERRY were material to the above loan

transactions with Southtrust, First Bank, First Tuskegee, and Bank of Wedowee.

Moreover, the similar false statement of assets to Small Town was similarly

material in that it related to the material fact of the collateral offered by ROY

TERRY to secure the loan he was seeking.

## ROY TERRY AUTHORIZES THE PRODUCTION OF MATERIALLY FALSE
## QUARTERLY STATEMENTS OF TERRY MANUFACTURING

68.     ROY TERRY authorized and counseled others known to the United States

Attorney to produce materially false quarterly statements for Terry Mfg.

69.     Pursuant to the loan agreements with Southtrust and First Bank, Terry Mfg. was to

provide quarterly statements detailing Terry Mfg.'s assets and liabilities.

70.     These statements were generated on a quarterly basis and produced by Terry Mfg.

executive known to the United States Attorney. The statements were produced in

coordination with ROY TERRY in his role as Terry Mfg.'s Chief Executive

Officer.

71.    The quarterly statements contained materially false information in that they grossly overstated Terry Mfg.'s level of inventory and accounts receivable.

72.    For example, the quarterly statement produced to Southtrust and First Bank on May 15, 2003, which was for the quarter ending on March 31, 2003, listed accounts receivable and inventory in excess of $37 million.

73.    As shown infra at paragraphs 97 through 100, ROY TERRY soon thereafter admitted to Southtrust and First Bank that Terry Mfg.'s level of inventory and accounts receivable was worth less that $2 million.

74.    Terry Mfg.'s misstated financial figures were relied upon by lending institutions and had the true financial state of Terry Mfg. been known, no further loans would have been extended and any outstanding loans would have been called for payment.  Accordingly, the misstatements in the quarterly financial statements were material.

## ROY TERRY CONTEMPLATES COLLAPSE OF TERRY MFG. AND NEED FOR FURTHER BANK FRAUD IN FEBRUARY 2001

75.    ROY TERRY knew that Terry Mfg. was in an untenable financial position by as early as February 2001.

76.    On February 8, 2001, ROY TERRY wrote the following comments on stationary labeled "From the desk of Roy Terry" which expressly contemplated the hopeless and desperate state of Terry Mfg.'s financial condition:

Strategy, etc.
*Suppose USDA/Southtrust, etc want to avoid filing.  Try to work out,

etc.?  Will this just complicate & prolong everything if we know it is
helpless?
*Should filing already be done or ready to be done when they are
notified(?)
*Storyline: To be as honest as possible but careful w/ admissions that
might go to intent, etc. in legal situation . . .
*Would filing be for shut-down or for Re-originization [sic](?)
*Is it best to file voluntarily or fight until forced(?)
*Thought: If going to lose every pc of property & every asset anyway, why
not begin liquidating them . . . (?)

77.    On February 19, 2001, ROY TERRY wrote a note on his stationary contemplating

using funds from a business deal with Cintas Corporation ("Cintas") to "keep

things going."   He expressly contemplated the prospect of "default" and noted:

"Would likely require agmt. w/ USDA/Banks, w/ Horton & w/ other creditors."

ROY TERRY wrote the following, which was annotated by an asterisk:

"*Question is: Can such a re-arrangement ever turn the cash flow/profitability

corner?"

78.    In his February 19, 2001, note on his stationary, ROY TERRY expressly noted

that Terry Mfg.'s books were erroneous – "Would get books corrected (?)"

## ROY TERRY ACKNOWLEDGES FALSITY OF FINANCIAL STATEMENTS IN 2001 NOTE

79.    In or about February 2001, ROY TERRY noted on his stationary that Terry Mfg.'s

situation was "hopeless" and described the situation as "a nightmare."

80.    ROY TERRY wrote the following in the same note, which expressly

acknowledges that Terry Mfg.'s financial statements were false:

*Note:  There will be pressure by all major parties to continue
(Banks/USDA, Horton, etc.) so as not to lose everything they have in.  We

-20-

would have to explain why it is "hopeless." [Financials not correct.]

81.    Additionally, the same 2001 note asked: "Is Bankruptcy which attempts to continue operation feasible?"

## ROY TERRY SUGGESTS IN APRIL 2001 THAT HE PLANNED TO SEEK ADDITIONAL LOANS FROM BANKS AND USDA TO CURE FINANCIAL WOES OF TERRY MFG.

82.    ROY TERRY wrote on or about April 9, 2001, that he contemplated seeking further loans from the banks and the USDA. In his note, he questioned whether he would be able to accomplish his objective in light of the amount of scrutiny and time required. In his note, he asked:

    a.    "USDA/Banks –> can it be done again?"

    b.    "Can we buy enough time to do it?"

    c.    "Can we pass scrutiny of doing it?

## ROY TERRY DIRECTS THE FALSIFICATION OF FINANCIAL STATEMENTS

83.    ROY TERRY directed Terry Mfg.'s in-house accountant to create bogus information for use in financial statements that were submitted to banks, including Southtrust and First Bank.

84.    For example, on or about March 31, 2002, ROY TERRY directed the in-house accountant, in writing, to develop false figures for the Terry Mfg. year-end statement for 2001.

85.    On that date, ROY TERRY wrote:

With respect to preparing for year-end stmt., I want to develop the
liabilities side of balance sheet, including the new loan, then work on
getting the asset side to match.  Please look at items marked on attached
pro forma done by West in the loan pkg. and help me to figure correct
figures for 12/31/2001. [The penciled figures in assets are just the
beginnings of some ideas for assets to account for the loan funds.]  Check
with me to explain better.

86.    Additionally, on or about November 11, 2002, ROY TERRY gave the following

written explanation and directive to the in-house accountant regarding the Terry

Mfg.'s quarterly financial statement for the third quarter of 2002:

This is a first draft on 3rd Qtr. Stmt.  It is attempting to add more to
Inventory and Receivables to show Southtrust why we are low on cash, but
that is for a "good" reason (build up of Desert Camo, etc.).  Please look at
and give any comments or problems that you see.

87.    The instructions regarding Terry Mfg.'s quarterly financial statement for the third

quarter of 2002 were written at approximately the same time ROY TERRY was

seeking an additional loan from Southtrust and during a time when quarterly

financial statements were required for the prior loans issued by Southtrust and

First Bank.

## ROY TERRY MAKES FALSE REPRESENTATIONS TO SOUTHTRUST AND FIRST BANK REGARDING CONDITION OF COMMON STOCK PLEDGED TO SECURE LOAN

88.    In the Loan and Security Agreement ("2001 Loan Agreement") underlying the

October 23, 2001, loan from First Bank and Southtrust, ROY TERRY represented

that "[t]here are no outstanding warrants, options or other rights to acquire the

capital stock of Borrower."  The term "Borrower" was defined in the 2001 Loan

Agreement to mean Terry Mfg.

89.    ROY TERRY further represented that "[t]he authorized capital stock of the
       Borrower consists of 10,000 shares of Common Stock, of which 5,000 shares of
       Common Stock are currently issued and outstanding.  Roy Terry holds fifty-one
       percent (51%) of such Common Stock and Rudolph Terry holds forty-nine percent
       (49%) of such common stock."

90.    In sum, ROY TERRY represented that either he or his brother owned all shares of
       Terry Mfg. common stock and that there were no warrants, options, or other rights
       of third parties attached to those shares.

91.    ROY TERRY's representations regarding Terry Mfg.'s Common Stock and the
       ownership of such stock were false when made.

92.    Before entering into the 2001 Loan Agreement, specifically on or about
       November 10, 2000, ROY TERRY, along with another person known to the
       United States Attorney, assigned a large portion of Terry Mfg. Common Stock to
       ARE, as part of the security pledged in a Line of Credit Promissory Note executed
       on or about that date as part of a $5.5 million loan.

93.    Specifically, ROY TERRY, along with another person known to the United States
       Attorney, represented that, through the Line of Credit Promissory Note, he
       "hereby delivers, pledges, assigns, conveys, and transfers to the Holder [ARE] the
       following described property (hereinafter referred to as collateral): . . . . 2.
       Twenty (20%) percent of the common stock of Terry Manufacturing Company,
       Inc., including those shares represented by Certificate Number 9 (200 shares),

-23-

Certificate Number 11 (300 shares), Certificate 12 (200 shares), and Certificate Number 15 (200 shares)."

94.    ROY TERRY's misrepresentations regarding Terry Mfg. common stock in the 2001 Loan Agreement were materially false in that they were made to induce Southtrust and First Bank to issue $8.5 million in loans contemplated in the agreement.

95.    Indeed, under the "Representations and Warranties" heading, the 2001 Loan Agreement stated "[i]n order to induce Bank to enter into this Agreement and to make or extend the Loans, all as contemplated hereby, Borrower and Guarantors represent and warrant to Bank, each of which representations and warranties is deemed to be material. . . ."

96.    This statement of express, intended materiality preceded ROY TERRY's misrepresentations regarding the ownership and state of Terry Mfg.'s common stock, which was made in Paragraph 6.13 of the Agreement, which bore the heading: "Stock."

**ROY TERRY ADMITS TO OVERSTATING TERRY MFG. INVENTORY AND ACCOUNTS RECEIVABLE TO BANK AUDITORS THROUGH "MAY 31 LISTING"**

97.    On or about June 26, 2003, ROY TERRY presented bank auditors, bank representatives, and representatives of the USDA, with a revised listing of Terry Mfg. inventory and accounts receivable. The listing purported to state accurate figures for inventory and accounts receivable as of May 31, 2003 (hereinafter "May 31 Listing").

-24-

98.   The May 31 Listing stated that Terry Mfg.'s "estimated" inventory was $812,440 as of May 31, 2003, and Terry Mfg.'s accounts receivable was $1,033,516.50 as of the same date.

99.   The inventory and accounts receivable information stated in the May 31 Listing differed from, and contradicted, the figures provided by ROY TERRY on behalf of Terry Mfg. on other, previous occasions. Indeed, the May 31 Listing stated that Terry Mfg.'s accounts receivable and inventory were approximately $35 million less than ROY TERRY had represented in or about April 2003 in Terry Mfg.'s 2002 Audited Financials.

100.  In his June 26, 2003, meeting with bank and USDA representatives, which occurred at First Bank in Roanoke, Alabama, ROY TERRY refused to answer or discuss the disappearance or misstatement of approximately $35 million in assets that had previously been reported as belonging to Terry Mfg. and which had been pledged as collateral to secure loans. Rather, ROY TERRY expressed an interest in obtaining additional time or loans to remedy Terry Mfg.'s delinquency with Southtrust and First Bank.

### COUNT 1

### BANK FRAUD

### 18 U.S.C. § 1344

### SOUTHTRUST AND FIRST BANK

101.  The United States Attorney hereby realleges and incorporates paragraphs 1 through 100, as if fully alleged herein.

-25-

102.    From in or about August 1995, and ending on or about July 7, 2003,

ROY TERRY,

defendant herein, while aided and abetted by others known and unknown to the

United States Attorney, devised a scheme and artifice,

(a) to defraud Southtrust and First Bank, both insured depository

institutions within the definition of Section 3(c)(2) of the Federal Deposit

Insurance Act, and

(b) to obtain moneys, funds, credits, assets, and loans owned by and under

the custody and control of Southtrust and First Bank, by means of false

and fraudulent pretenses, representations, and promises.

103.    It was part of the scheme and artifice that ROY TERRY made the material

misstatements to Southtrust and First Bank through false financial documents, as

alleged supra in paragraphs 55 through 100, for the purposes of obtaining and

keeping the moneys, funds, credits, assets, and loans of Southtrust and First Bank

that were extended to Terry Mfg. through the loan transactions alleged supra in

paragraph 6.

104.    Through the course of the scheme to defraud, ROY TERRY obtained

approximately $28.5 million in funds belonging to and in the care, custody, and

control of Southtrust and First Bank through applications for loans jointly issued

by both banks and supported by a guarantee from the USDA.

105.    On or about July 7, 2003, Terry Mfg. filed for bankruptcy.

106.　At present, approximately $15 million in funds belonging and owed to, and formerly in the care, custody, and control of Southtrust and First Bank, and guaranteed in part by the USDA, remain unpaid and unrecovered from the bankrupt estate of Terry Mfg. for the loans jointly issued by Southtrust and First Bank.

107.　All of which was done in violation of Title 18, United States Code, Sections 1344 and 2.

**COUNT 2**

**BANK FRAUD**

**18 U.S.C. § 1344**

**SOUTHTRUST**

108.　The United States Attorney hereby realleges and incorporates paragraphs 1 through 100, as if fully alleged herein.

109.　Beginning in or about November 2002, and ending on or about July 7, 2003,

ROY TERRY,

defendant herein, while aided and abetted by others known and unknown to the United States Attorney, devised a scheme and artifice,

> (a) to defraud Southtrust, an insured depository institution within the definition of Section 3(c)(2) of the Federal Deposit Insurance Act, and
>
> (b) to obtain moneys, funds, credits, assets, and loans owned by and under the custody and control of Southtrust, by means of false and fraudulent pretenses, representations, and promises.

-27-

110. It was part of the scheme and artifice that ROY TERRY made the material misstatements to Southtrust through false financial documents, as alleged supra in paragraphs 55 through 100, for the purposes of obtaining and keeping the moneys, funds, credits, assets, and loans of Southtrust that were extended to Terry Mfg. through the loan transaction alleged supra in subparagraph 6(d).

111. Through the course of the scheme to defraud, ROY TERRY obtained approximately $2.5 million in funds belonging to and in the care, custody, and control of Southtrust.

112. On or about July 7, 2003, Terry Mfg. filed for bankruptcy.

113. At present, approximately $2.5 million in funds belonging and owed to, and formerly in the care, custody, and control of Southtrust (and separate and apart from the amounts owed to Southtrust in connection with Count 1) remain unpaid and unrecovered from the bankrupt estate of Terry Mfg. for the loan solely issued by Southtrust.

114. All of which was done in violation of Title 18, United States Code, Sections 1344 and 2.

## COUNT 3

### BANK FRAUD

### 18 U.S.C. § 1344

### BANK OF WEDOWEE

115. The United States Attorney hereby realleges and incorporates paragraphs 1 through 100, as if fully alleged herein.

116.    From in or about June 2002, until on or about July 7, 2003,

ROY TERRY,

defendant herein, while aided and abetted by others known and unknown to the
United States Attorney, devised a scheme and artifice,

> (a) to defraud the Bank of Wedowee, an insured depository institution
> within the definition of Section 3(c)(2) of the Federal Deposit Insurance
> Act, and
>
> (b) to obtain moneys, funds, credits, assets, and loans owned by and under
> the custody and control of the Bank of Wedowee, by means of false and
> fraudulent pretenses, representations, and promises.

117.    It was part of the scheme and artifice that ROY TERRY made the material
misstatements to the Bank of Wedowee through false financial documents, as
alleged supra in paragraphs 55 through 100, for the purposes of obtaining and
keeping the moneys, funds, credits, assets, and loans of the Bank of Wedowee that
were extended to ROY TERRY for the benefit of Terry Mfg. through the loan
transactions alleged supra in subparagraphs 7(a) through 7(b).

118.    Through the course of the scheme to defraud, ROY TERRY obtained over $2
million in funds belonging to and in the care, custody, and control of the Bank of
Wedowee through applications for loans issued by the Bank of Wedowee.

119.    On or about July 7, 2003, Terry Mfg. filed for bankruptcy.

120.    At present, approximately $1.8 million in funds belonging and owed to, and

formerly in the care, custody, and control of the Bank of Wedowee remain unpaid
and unrecovered from ROY TERRY and the bankrupt estate of Terry Mfg.

121.   All of which was done in violation of Title 18, United States Code, Sections 1344
and 2.

**COUNT 4**

**BANK FRAUD**

**18 U.S.C. § 1344**

**SMALL TOWN**

122.   The United States Attorney hereby realleges and incorporates paragraphs 1
through 100, as if fully alleged herein.

123.   From in or about June 2002, until on or about July 7, 2003,

ROY TERRY,

defendant herein, while aided and abetted by others known and unknown to the
United States Attorney, devised a scheme and artifice,

> (a) to defraud Small Town, an insured depository institution within the
> definition of Section 3(c)(2) of the Federal Deposit Insurance Act, and
>
> (b) to obtain moneys, funds, credits, assets, and loans owned by and under
> the custody and control of Small Town, by means of false and fraudulent
> pretenses, representations, and promises.

124.   It was part of the scheme and artifice that ROY TERRY made the material
misstatements to Small Town through false financial documents, as alleged <u>supra</u>

in paragraphs 55 through 100, for the purposes of obtaining and keeping the

moneys, funds, credits, assets, and loans of Small Town that were applied for by

ROY TERRY for the benefit of Terry Mfg. through the loan transaction alleged

supra in subparagraph 7(d).

125.   Through the course of the scheme to defraud, ROY TERRY sought to obtain

approximately $1.75 million in funds belonging to and in the care, custody, and

control of Small Town through applications for loans issued by Small Town.

126.   All of which was done in violation of Title 18, United States Code, Sections 1344

and 2.

## COUNT 5

## BANK FRAUD

## 18 U.S.C. § 1344

## FIRST TUSKEGEE

127.   The United States Attorney hereby realleges and incorporates paragraphs 1

through 100, as if fully alleged herein.

128.   From in or about January 2003, until on or about July 7, 2003,

### ROY TERRY,

defendant herein, while aided and abetted by others known and unknown to the

United States Attorney, devised a scheme and artifice,

(a) to defraud First Tuskegee, an insured depository institution within the

definition of Section 3(c)(2) of the Federal Deposit Insurance Act, and

(b) to obtain moneys, funds, credits, assets, and loans owned by and under

-31-

the custody and control of First Tuskegee, by means of false and fraudulent pretenses, representations, and promises.

129.   It was part of the scheme and artifice that ROY TERRY made the material misstatements to First Tuskegee through false financial documents, as alleged supra in paragraphs 55 through 100, for the purposes of obtaining and keeping the moneys, funds, credits, assets, and loans of First Tuskegee that were extended to ROY TERRY for the benefit of Terry Mfg. through the loan transactions alleged supra in subparagraphs 7(c) through 7(e).

130.   Through the course of the scheme to defraud, ROY TERRY obtained over $1 million in funds belonging to and in the care, custody, and control of First Tuskegee through applications for loans issued by First Tuskegee.

131.   On or about July 7, 2003, Terry Mfg. filed for bankruptcy.

132.   At present, approximately $949,000 in funds belonging and owed to, and formerly in the care, custody, and control of First Tuskegee remain unpaid and unrecovered from ROY TERRY and the bankrupt estate of Terry Mfg.

133.   All of which was done in violation of Title 18, United States Code, Sections 1344 and 2.

## COUNT 6

## BANK FRAUD

## 18 U.S.C. § 1344

## CHECK KITING

134.   The United States Attorney hereby realleges and incorporates paragraphs 1

through 100, including specifically paragraphs 47 through 54, as if fully
alleged herein.

135.    From a date unknown to the United States Attorney and continuing until on or
about February 28, 2003,

ROY TERRY,

defendant herein, devised a scheme and artifice,

(a) to defraud Bank of Wedowee and First Bank, both insured depository
institutions within the definition of Section 3(c)(2) of the Federal Deposit
Insurance Act, and

(b) to obtain moneys, funds, credits, assets, and loans owned by and under
the custody and control of Bank of Wedowee and First Bank, by means of
false and fraudulent pretenses, representations, and promises.

136.    It was part of the scheme and artifice that, for a number of months, including
the period from January 1, 2003, through February 18, 2003, ROY TERRY
engaged in a pattern of check kiting during which he would deposit Terry
Mfg. checks written on an account at Bank of Wedowee (Acct. No. 5011256)
into another Terry Mfg. account at First Bank (Acct. No. 1109308), and then
do the same process in reverse from Acct. No. 1109308 into Acct. No.
5011256.

137.    Through the course of the scheme to defraud, ROY TERRY fraudulently
obtained approximately $2,460,098 in funds belonging to and in the care,

-33-

custody, and control of Bank of Wedowee and First Bank through checks and expenditures from accounts at those banks that were based on the over $8,500,000 in checks written between the two accounts as part of the check kiting scheme.

138.    On or about July 7, 2003, Terry Mfg. filed for bankruptcy.

139.    The fraudulent check kiting scheme was material in that without the fraudulent check kiting scheme, ROY TERRY and Terry Mfg. would not have been entitled to spend or withdraw the approximately $2,460,098 funds obtained between January 1, 2003, and February 18, 2003, from the Bank of Wedowee and First Bank.

140.    All of which was done in violation of Title 18, United States Code, Section 1344.

## COUNT 7

## MISUSE OF PENSION FUNDS

### 18 U.S.C. § 664

141.    The United States Attorney hereby realleges and incorporates paragraphs 1 through 100, as if fully alleged herein.

142.    At the times material to this Information, over 200 individuals participated in the Terry Manufacturing Company 401K Profit Sharing Plan.

143.    Beginning in or about February 2001 and continuing until on or about July 7, 2003, in the Middle District of Alabama, and elsewhere,

ROY TERRY,

-34-

the defendant herein, while aided and abetted by others known and unknown

to the United States Attorney, did embezzle, steal and unlawfully and willfully

abstract and convert to his own use and the use of Terry Mfg. in the

approximate amount of $175,000 in the moneys, funds, securities, premiums,

credits, property and other assets of the Terry Manufacturing Company 401K

Profit Sharing Plan, an employee pension benefit plan, subject to Title I of the

Employee Retirement Income Security Act of 1974, and of funds withheld

from employee wages and contractually obligated to such plan, all of which

was done in violation of Title 18, United States Code, Section 664.

## COUNT 8

## WIRE FRAUD

## 18 U.S.C. § 1343

## STODDARD & BERNARD

144.    The United States Attorney hereby realleges and incorporates paragraphs 1

through 100, as if fully alleged herein.

### THE FRAUDULENT SCHEME

145.    From in or about September 2002 through on or about July 7, 2003, within the

Middle District of Alabama, and elsewhere,

### ROY TERRY,

defendant herein, devised and intended to devise a scheme and artifice to

defraud Stoddard & Bernard and to obtain monies from these said individuals

by means of false and fraudulent pretenses, and representations, well knowing

-35-

at the time that such pretenses and representations were false and fraudulent
when made; said scheme and artifice being in substance as alleged supra in
subparagraphs 8(a), 8(c), and 8(g) through 8(k).

### THE WIRE TRANSFERS

146.    In September 2002, within the Middle District of Alabama, and elsewhere,
ROY TERRY, for the purpose of executing the above described scheme and
artifice, knowingly and willfully caused to be transmitted by means of wire
communication, in interstate commerce, facsimile and telephone
communications directed to Stoddard & Bernard, both of whom were located
outside of Alabama, that materially misrepresented: (1) the financial
condition of Terry Mfg., including overstating Terry Mfg.'s inventory and
receivables as alleged supra at subparagraph 8(j); (2) the existence of an
option for military camouflage fabric that did not exist; (3) the true purpose of
the loan money requested by ROY TERRY from Stoddard & Bernard, which
was not pursuant to any option for fabric, but was for general operating
expenses for Terry Mfg. at a time when Terry Mfg. was in dire need for
working capital; and (4) the value of the common stock in Terry Mfg. pledged
by ROY TERRY as collateral for the loan.

147.    The misrepresentations identified above were material in that, if the true
version of each fact had been presented to Stoddard & Bernard, Stoddard &
Bernard would not have loaned Terry Mfg. money in September 2002
pursuant to the Confidential Memorandum and Proposal sent by ROY

-36-

TERRY to Stoddard & Bernard.

148.    All of which was done in violation of Title 18, United States Code, Section
        1343.

## COUNT 9

## WIRE FRAUD

### 18 U.S.C. § 1343

## SWANSON

149.    The United States Attorney hereby realleges and incorporates paragraphs 1
        through 100, as if fully alleged herein.

### THE FRAUDULENT SCHEME

150.    From in or about September 2002 through on or about July 7, 2003, within the
        Middle District of Alabama, and elsewhere,

### ROY TERRY,

defendant herein, devised and intended to devise a scheme and artifice to

defraud Swanson and to obtain monies from Swanson by means of false and

fraudulent pretenses, and representations, well knowing at the time that such

pretenses and representations were false and fraudulent when made; said

scheme and artifice being in substance as alleged supra in subparagraphs 8(b),

8(d), and 8(g) through 8(k).

### THE WIRE TRANSFERS

151.    In September 2002, within the Middle District of Alabama, and elsewhere,
        ROY TERRY, for the purpose of executing the above described scheme and

-37-

artifice, knowingly and willfully caused to be transmitted by means of wire communication, in interstate commerce, facsimile and telephone communications directed to Swanson, who was located outside of Alabama, that materially misrepresented: (1) the financial condition of Terry Mfg., including overstating Terry Mfg.'s inventory and receivables as alleged supra at paragraph 8(j); (2) the existence of an opportunity to obtain military camouflage fabric at a deeply discounted cost, when such opportunity did not exist; and (3) the true purpose of the loan money requested by ROY TERRY from Swanson, which was not pursuant to an opportunity to acquire military camouflage fabric at deeply discounted cost, but was for general operating expenses for Terry Mfg. at a time when Terry Mfg. was in need of working capital.

152.    The misrepresentations identified above were material in that, if the true version of each fact had been presented to Swanson, Swanson would not have loaned Terry Mfg. money in September 2002 pursuant to the Confidential Memorandum and Proposal sent by ROY TERRY to Swanson.

153.    All of which was done in violation of Title 18, United States Code, Section 1343.

## COUNT 10

### WIRE FRAUD

### 18 U.S.C. § 1343

### ROBINSONS

154.    The United States Attorney hereby realleges and incorporates paragraphs 1
through 100, as if fully alleged herein.

### THE FRAUDULENT SCHEME

155.    From in or about August 2001 through on or about July 7, 2003, within the
Middle District of Alabama, and elsewhere,

### ROY TERRY,

defendant herein, devised and intended to devise a scheme and artifice to

defraud the Robinsons and to obtain monies from these said individuals by

means of false and fraudulent pretenses, and representations, well knowing at

the time that such pretenses and representations were false and fraudulent

when made; said scheme and artifice being in substance as alleged supra in

paragraphs 9 through 21.

### THE WIRE TRANSFERS

156.    In August 2001, September 2002, and April 2003, within the Middle District

of Alabama, and elsewhere, ROY TERRY, for the purpose of executing the

above described scheme and artifice, knowingly and willfully caused to be

transmitted by means of wire communication, in interstate commerce,

facsimile and telephone communications directed to the Robinsons, who were

-39-

located outside of Alabama, that materially misrepresented: (1) the financial condition of Terry Mfg., including overstating Terry Mfg.'s inventory and receivables as alleged supra at paragraphs 12 and 17; (2) the existence of an contractual agreement with a radio personality for the exclusive rights to manufacture a clothing line, when in fact no such exclusive agreement existed; (3) the true purpose of the loan money requested by ROY TERRY from the Robinsons, which was not for a separate clothing line or capital to bridge the gap during a gap in DOD payments, but was in fact necessary to supply working capital for the day-to-day operations of Terry Mfg., which was in dire need of money; (4) failed to disclose the fact that, on July 7, 2003, Terry Mfg. had filed for bankruptcy; and (5) failed to disclose the "May 31 Listing," which had been disclosed to other creditors in June 2003, when that document would show the Robinsons that the 2001 Audited Financials produced in September 2002 overstated Terry Mfg.'s level of assets, including inventory and accounts receivable, by over $30 million.

157.    The misrepresentations identified above were material in that, if the true version of each fact had been presented to the Robinsons, the Robinsons would not have loaned Terry Mfg. money in September 2001, and certainly would not have extended those loans. Moreover, if the true state of Terry Mfg. had been known, the Robinsons similarly would not have invested additional capital in Terry Mfg. in April 2003 and would have demanded a return of their investment before the July 7, 2003, filing date for bankruptcy.

158.    All of which was done in violation of Title 18, United States Code, Section 1343.

## COUNT 11

### WIRE FRAUD

### 18 U.S.C. § 1343

### HLC AND EULER

159.    The United States Attorney hereby realleges and incorporates paragraphs 1 through 100, as if fully alleged herein.

### THE FRAUDULENT SCHEME

160.    From in or about February 2001 through on or about July 7, 2003, within the Middle District of Alabama, and elsewhere,

### ROY TERRY,

defendant herein, devised and intended to devise a scheme and artifice to defraud HLC and Euler and to obtain monies and property, including credit, from these said individuals by means of false and fraudulent pretenses, and representations, well knowing at the time that such pretenses and representations were false and fraudulent when made; said scheme and artifice being in substance as alleged supra in paragraphs 22 through 28.

### THE WIRE TRANSFERS

161.    In Roanoke, Alabama, within the Middle District of Alabama, and elsewhere, ROY TERRY, for the purpose of executing the above described scheme and artifice, knowingly and willfully caused to be transmitted by means of wire

communication, in interstate commerce, facsimile and telephone communications directed to the Euler through HLC, both of whom were located outside of Alabama, that contained material misrepresentations, as fully alleged supra at paragraphs 22 through 28 and 55 through 62.

162.     The misrepresentations identified above were material in that, if the true version of each fact had been presented to the Euler and HLC, HLC would not have extended credit to Terry Mfg., and Euler would not have insured the credit extended to Terry Mfg. by HLC. Accordingly, HLC would not have extended to Terry Mfg. approximately $1.9 million in credit prior to the bankruptcy, and Euler would not face a claim for approximately $1.5 million in credit insurance payments to HLC for HLC's approximately $1.9 million in losses to Terry Mfg.

163.     All of which was done in violation of Title 18, United States Code, Section 1343.

## COUNT 12

## MAIL FRAUD

### 18 U.S.C. § 1341

### MCCORVEY INVESTORS

164.     The United States Attorney hereby realleges and incorporates paragraphs 1 through 100, as if fully alleged herein.

-42-

## THE FRAUDULENT SCHEME

165.    From in or about March 2003 through on or about July 7, 2003, within the

Middle District of Alabama, and elsewhere,

### ROY TERRY,

defendant herein, devised and intended to devise a scheme and artifice to

defraud the McCorvey Investors and to obtain monies from these said

individuals by means of false and fraudulent pretenses, and representations,

well knowing at the time that such pretenses and representations were false

and fraudulent when made; said scheme and artifice being in substance as

alleged supra in subparagraphs 8(e) through 8(k).

## THE MAILING

166.    In March 2003, within the Middle District of Alabama, ROY TERRY, for the

purpose of executing the above described scheme and artifice, knowingly and

willfully caused correspondence and documents to be delivered and sent by a

private and commercial delivery service carrier to Roosevelt McCorvey in

Montgomery, Alabama.

## MATERIALITY

167.    The misrepresentations identified above were material in that, if the true

version of each fact had been presented to the McCorvey Investors, the

McCorvey Investors would not have loaned Terry Mfg. money in March 2003

pursuant to the Confidential Memorandum and Proposal sent by ROY

TERRY to the McCorvey Investors.

-43-

168.    All of which was done in violation of Title 18, United States Code, Section

1341.

## COUNT 13

## INTERSTATE TRANSPORTATION OF FUNDS OBTAINED BY FRAUD

## 18 U.S.C. § 2314

## HORTON INVESTMENTS

169.    The United States Attorney hereby realleges and incorporates paragraphs 1

through 100, including specifically paragraphs 29 through 46, as if fully

alleged herein.

170.    Beginning in or about November 2002 and continuing until in or about March

2001, in the Middle District of Alabama and elsewhere,

ROY TERRY,

defendant herein, did unlawfully transport and cause to be transported in

interstate commerce from in or about Eatonton, Georgia, to in or about

Roanoke, Alabama, securities taken by fraud, to wit, checks written by

Blasingame, Burch, Garrard, Bryant & Ashley, P.C., on behalf of American

Real Estate, of the value of $5,000 or more, namely checks in the following

approximate values written on or about the following dates:

| November 10, 2000 | Check No. 1768 | $1,994,960 |
| December 15, 2000 | Check No. 1795 | $1,000,000 |
| January 15, 2001 | Check No. 1810 | $1,000,000 |
| February 15, 2001 | Check No. 10004 | $1,000,000 |
| March 15, 2001 | Check No. 10016 | $500,000 |

knowing the same to have been taken by fraud, in violation of Title 18, United

States Code, Section 2314.

LEURA GARRETT CANARY
UNITED STATES ATTORNEY

MATTHEW S. MINER
ASSISTANT UNITED STATES ATTORNEY